IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

OSCAR E. LARSON, JR.,           §
                               §
                Plaintiff,     §
                               § Civil Action No. 3:06-CV-1496-D
VS.                            §
                               §
GREGORY J. MATTER, M.D.,        §
et al.,                        §
                               §
                Defendants.    §

MEMORANDUM OPINION
AND ORDER

In this medical malpractice suit brought by plaintiff Oscar E.
Larson, Jr. ("Larson") against defendants Gregory Matter, M.D.
("Dr. Matter"), a cardiovascular surgeon, and Baylor University
Medical Center of Dallas ("Baylor"), defendants move to exclude the
testimony of three of Larson's expert witnesses.[1] Defendants also
move in separate motions for summary judgment on Larson's
negligence and gross negligence claims. For the reasons that
follow, the court grants in part and denies in part Dr. Matter's
motions to exclude expert testimony, denies Baylor's motions to
exclude, and grants both motions for summary judgment to the extent
they seek dismissal of Larson's gross negligence claims, and

_____

[1]Defendants have filed various motions relating to Larson's
expert witnesses, including objections to the qualifications and
testimony of Brian M. Camazine, M.D. ("Dr. Camazine"), Thomas W.
Froehlich, M.D. ("Dr. Froehlich"), and Gregory Carlson, R.N.
("Nurse Carlson"); a motion to strike experts Drs. Camazine and
Froehlich; and motions to exclude the causation testimony of Drs.
Camazine and Froehlich. Because these motions present overlapping
arguments, the court will address them together.

otherwise denies the motions.

I

Larson was 59 years-old when he was admitted to Baylor in 2004 with a diagnosis of acute myocardial infarction.[2]  To treat him, Dr. Matter performed coronary artery bypass graft ("CABG") surgery on August 24, 2004.  Larson subsequently developed Heparin Induced Thrombocytopenia ("HIT") and Heparin Induced Thrombosis Syndrome ("HITTS"),[3] leading to multiple amputations affecting all four extremities, including a right leg amputation below the knee, left foot amputation, and amputation of all fingers of both hands. HIT/HITTS is a condition that can arise when a patient is exposed to Heparin, an anti-coagulant.  Dr. Matter testified that, following the CABG operation, he ordered Heparin therapy for Larson as a treatment for pulmonary emboli.  On September 1 Larson was diagnosed with HIT/HITTS.  On the same day, Dr. Matter ordered that the Heparin treatment cease and that Lepirudin be administered as an alternative anti-coagulant.

---

[2]The court recounts the evidence in a light favorable to Larson as the summary judgment nonmovant and draws all reasonable inferences in his favor. *E.g.*, *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n. 2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

[3]Although noting the distinctions between HIT and HITTS, Larson generally refers to the two conditions together as "HIT/HITTS."  Because none of the issues presented requires distinguishing between the two conditions, the court adopts the "HIT/HITTS" notation throughout this memorandum opinion and order for the sake of simplicity.

Larson contends that Dr. Matter was negligent and grossly negligent in failing to timely diagnose and treat the development of HIT/HITTS. In particular, Larson contends that by August 30, Dr. Matter should have recognized the signs and symptoms of HIT/HITTS, ordered cessation of the Heparin, and initiated Lepirudin treatment. Larson maintains that, at a minimum, Dr. Matter should have consulted a hematologist, who would have ordered the proper treatment. He also alleges that, by and through its nursing staff, Baylor was negligent in failing to timely recognize the development of HIT/HITTS and ensure that corrective treatment was taken. Larson posits that had Dr. Matter and Baylor diagnosed and initiated treatment for HIT/HITTS by August 30, most of his injuries would have been prevented.

II

The court turns first to defendants' motions to exclude the testimony of plaintiff's experts Thomas W. Froehlich, M.D. ("Dr. Froehlich"), Brian M. Camazine, M.D. ("Dr. Camazine"), and Gregory Carlson, R.N. ("Nurse Carlson").

The court may consider preliminary questions concerning the admissibility of evidence before trial. *See* Fed. R. Evid. 104(a). In performing this function, the court must at times act as a gatekeeper in determining the admissibility of expert testimony. *See, e.g., Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997); *Garcia v. Columbia Med. Ctr. of Sherman*, 996 F. Supp.

617, 620 (E.D. Tex. 1998).  Rule 702 guides the court in the screening process.  *See Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306, 1308 (S.D. Miss. 1997).[4]  The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Watkins*, 121 F.3d at 988-89.

Expert testimony must be based on "scientific, technical, or other specialized knowledge."  Rule 702.  And it must rest on a reliable foundation.  *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (per curiam).  Because of the unique effect of an expert witness and the advantageous position he holds at trial, the proponent of the evidence must demonstrate that "the principle supports what it purports to show."  *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995).  This ensures that the

---

[4]Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152; *see Garcia*, 996 F.Supp. at 620 (noting that reliability requirement ensures that knowledge offered is "supported by appropriate validation" and "establishes a standard of evidentiary reliability") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993)). Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be based on "good grounds." *Posado*, 57 F.3d at 433 (quoting *Daubert*, 509 U.S. at 590). The testimony must constitute "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

In fulfilling its gatekeeping role, the court must make an objective, independent validation of the principles and methods the expert used, to ensure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue. *Garcia*, 996 F.Supp. at 622. The court is not to focus on the conclusions generated by the expert's methodology. *Watkins*, 121 F.3d at 989. Instead, the court must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant. *Kumho*, 526 U.S. at 153; *see Watkins*, 121 F.3d at 989.

When analyzing the reliability of an expert's testimony, the court may consider the following non-exclusive factors: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. "The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Kumho*, 526 U.S. at 150.

III

A

The court considers first the admissibility of the testimony of Dr. Froehlich and Dr. Camazine that Dr. Matter breached the standard of care.[5]

1

Dr. Matter maintains that Dr. Froehlich, a hematologist, lacks the required education, training, and experience to offer an

---

[5]Dr. Matter also moves to exclude any testimony by Nurse Carlson on this issue. Larson responds by stipulating that Nurse Carlson will not testify as to Dr. Matter's standard of care or medical causation, but will instead offer an opinion only on the standard of care applicable to nurses. Based on this stipulation, Dr. Matter's motion to exclude the testimony of Nurse Carlson is denied as moot.

opinion as to the standard of care applicable to Dr. Matter, a cardiovascular surgeon. Larson responds that Dr. Froehlich is qualified to testify in this instance because he will opine in an area that "is common and equally recognized and developed in all fields of practice," and thus does not require specific cardiovascular experience. P. Br. 6. The court disagrees. As explained below, Dr. Froehlich's deposition testimony demonstrates that his experience as a hematologist does not reliably reflect the level of understanding in "all fields of practice," including that of a cardiovascular surgeon who is not a hematologist.

According to Dr. Froehlich, due to the amount of attention HIT/HITTS has received and the efforts undertaken in recent years to educate cardiovascular surgeons, a cardiovascular surgeon today should be able to recognize and respond to HIT/HITTS. P. Mar. 14, 2008 App. Ex. B at 72.[6] But he concedes that his expectations regarding a cardiovascular surgeon in 2004, when Larson was injured, would be different. He explains that, in 2004, he and other hematologists would certainly have been able to recognize and respond to HIT/HITTS, but Dr. Froehlich "wouldn't have expected . . . cardiothoracic surgeons [to be] as good at recognizing it." *Id.* In fact, during that period, Dr. Froehlich and other hematologists "often got called [by cardiothoracic surgeons to a

---

[6]The court is citing the appendix in this manner because it is not paginated as required by N.D. Tex. Civ. R. 7.1(i)(4).

HIT/HITTS situation] late, and . . . saw a lot of complications as a result." *Id.* Thus because "the whole field has evolved pretty rapidly in the last several years in terms of dealing with [HIT/HITTS]," Dr. Froehlich cannot predict what a hospital's protocols for dealing with it would have been in 2004. *Id.* at 122-23. And perhaps for these reasons, he at one point disavows any intent to opine as to the standard of care for cardiovascular surgeons, stating: "I'm not going to testify as to the standard of care for the cardiovascular surgeons." *Id.*

In a medical malpractice case, "[t]he standard of care is defined according to what an ordinarily prudent physician would have done under the same or similar circumstances." *Palafox v. Silvey,* 247 S.W.3d 310, 318 (Tex. App. 2007, no pet.). The court concludes that Dr. Froehlich is not qualified to opine that Dr. Matter breached his standard of care, and he lacks good grounds for rendering such an opinion. He is unfamiliar with the relevant governing protocols for cardiovascular surgeons in 2004, admits that the surgeons' knowledge concerning HIT/HITTS would have been more limited than that of hematologists, and fails to present any other basis for opining that Dr. Matter failed to act according to what an ordinarily prudent cardiovascular surgeon would have done under similar circumstances in 2004. Larson's insistence that it is unnecessary for his expert witness to be a cardiovascular surgeon is beside the point. Even if a hematologist *could be*

qualified and *could* render a reliable opinion, the record shows that Dr. Froehlich——the hematologist proffered *in this case*——lacks the required qualifications and is rendering an opinion that is not based on good grounds. Accordingly, the court grants Dr. Matter's motion to strike in this respect.

2

Dr. Matter similarly moves to strike Dr. Camazine's testimony regarding the standard of care because he is a general surgeon who specializes in thoracic surgery, not a cardiovascular surgeon. The court denies the motion.

It does not follow from the analysis of Dr. Froehlich's testimony that Dr. Camazine's opinions should also be excluded. Dr. Froehlich, a hematologist, possessed a higher level of specialized knowledge in this area; he could not reliably opine regarding the level of knowledge that a non-hematologist such as Dr. Matter should have had. But Dr. Camazine is not a hematologist; he is a general surgeon who specializes in thoracic surgery. His testimony as a general surgeon (and not as a hematologist) regarding what he would (and should) have known regarding the appropriate response in Larson's case is thus a more reliable indicator of what Dr. Matter should have known. It is not determinative that Dr. Camazine specializes in an area other than cardiovascular surgery, because the medical issues involved with critical postoperative care and anticoagulants are the same or

similar in either field. *See* D. Matter Mar. 14, 2008 App. Ex. A at 2 (Dr. Camazine expert report); *id.* Ex. B at 117-18 (Dr. Camazine deposition).[7] Thus the mere fact that Dr. Camazine is a general surgeon is not a basis for excluding his testimony. And because Dr. Camazine's testimony has withstood a *Daubert* challenge, to the extent it has weaknesses, they can be explored before the jury on cross-examination. *See Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 485 (5th Cir. 2008) (holding, *inter alia*, that criticism of expert testimony that had already withstood *Daubert* challenge "affect[s] the *weight* to be assigned to that opinion . . . and should be left for the *jury's* consideration." (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (emphasis added))); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted)).

---

[7]This appendix is also improperly paginated. *See supra* note 6.

Dr. Matter and Baylor also move to exclude the causation opinions of Drs. Froehlich and Camazine.[8]

Dr. Froehlich and Dr. Camazine opine that Larson would have suffered fewer injuries had his Heparin treatment been discontinued and had an alternative anticoagulant been administered starting August 30, 2004, and that had Dr. Matter at least consulted a hematologist, the proper treatment would have been ensured. Defendants move to exclude these opinions on the grounds they are not supported by literature, articles, or other studies, and they do not rule out the possibility that Larson would have suffered the same injuries in the absence of defendants' alleged negligence. The court disagrees.

---

[8]In December 2007, when Dr. Matter first filed his "objections" to the causation testimony of Drs. Froehlich and Camazine, he also objected to any "causation" testimony of Nurse Carlson. In January 2008, Larson responded to the objections regarding the expert causation testimony of Drs. Froehlich and Camazine, and to the other objections concerning Nurse Carlson, *see supra* note 5, but he did not address the objection to causation testimony by Nurse Carlson. In March 2008, Dr. Matter filed new and separate motions to exclude the causation testimony of Drs. Froehlich and Camazine (essentially re-urging the same arguments), but he did not move to exclude causation testimony of Nurse Carlson. Because it is unclear whether Larson intends to proffer Nurse Carlson to testify about causation, unclear whether Dr. Matter continues to challenge this testimony, and unnecessary, for purposes of deciding the summary judgment motions, to determine the admissibility of any such testimony, the court declines to address Dr. Matter's objection to causation testimony from Nurse Carlson. If Dr. Matter intends to pursue this objection, he may re-urge it without prejudice by filing a separate motion to exclude within 14 days of the date of this memorandum opinion and order.

There is no inherent requirement that an expert cite independent studies that support his conclusions. *See, e.g., Kumho*, 526 U.S. at 152 ("[*Daubert*'s purpose] is to make certain that an expert, whether basing testimony upon professional studies *or personal experience*, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." (emphasis added)). And the personal experiences of Drs. Froehlich and Camazine are sufficiently reliable that no independent studies are required. Dr. Froehlich testifies that he has seen and treated numerous patients over the years who have displayed the same constellation of symptoms and conditions as did Larson, and that he has personally compared the effects of a timely versus delayed response to HIT/HITTS. D. Matter Mar. 14, 2008 App. Ex. B. at 111. Similarly, Dr. Camazine testifies that, although he has not observed many HIT/HITTS cases, he has seen several medically analogous cases that involved postoperative critical care and anticoagulation. *See* D. Matter Mar. 14, 2008 Ex. A. at 2 (Dr. Camazine expert report); *id.* Ex. B. at 117-18 (Dr. Camazine deposition).

Although these personal experiences will undoubtedly be subjected to cross-examination, they constitute a sufficiently reliable basis for the experts' opinions that Larson would probably not have suffered the same injuries had Dr. Matter not been negligent. The causation opinions of Drs. Froehlich and Camazine

are sufficiently reliable to be presented to a jury.

Baylor cites *Nobel Insurance Co. v. Guillory*, 2000 WL 35608155 (N.D. Tex. Apr. 19, 2000) (Sanders, J.), in which Judge Sanders excluded expert testimony on the ground that it was not supported by studies or other literature. *Id.* at *1-*2. But *Nobel Insurance* is distinguishable because the expert testimony arose in a different factual context and demanded different indicia of reliability. The experts in that case had presented a novel theory for forecasting a party's liability on a bond, and they were not, as here, describing the likely effects of specific medical treatment based on their personal observations of those effects. *Id.*

Baylor also cites *Helm v. Swan,* 61 S.W.3d 493 (Tex. App. 2001), in which expert testimony was excluded on different grounds. Initially, the court notes that *Helm* is governed by *Texas* law, which does not apply here. *E.g., Phillips Oil Co. v. OKC Corp,* 812 F.2d 265, 280 (5th Cir. 1987) (holding that admissibility of expert testimony is governed by federal law). But to the extent that Texas law is analogous, *Helm* is distinguishable because the expert opinions were based entirely on medical literature that was found not to support the experts' ultimate conclusions. *See id.* at 496-97 (describing "[t]he scientific article that [the experts] . . . rely upon," and holding that "[n]othing in th[is] medical literature . . . supports [their] opinion"). By contrast, the

- 13 -

experts in this case base their opinions on personal observations that do support their conclusions.

Finally, defendants cite admissions in Dr. Froelich's and Dr. Camazine's deposition testimony that it is "possible" that Larson's injuries were not worsened by defendants' alleged negligence. These statements are not controlling, however, because "[c]ertainty is not required" as a precondition to expert admissibility in federal court. *See Posado,* 57 F.3d at 433. And under Texas substantive law,[9] a plaintiff need only prove that his theory of causation is "more likely than not" correct. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993) (internal quotation marks omitted). Thus the court's analysis is not affected by the fact that Larson's experts acknowledge the "possibility" that his injuries were not caused by negligent acts.

IV

The court now turns to defendants' motions for summary judgment.

Because Larson will bear the burden of proof at trial, the defendants can meet their summary judgment obligation by pointing the court to the absence of evidence to support Larson's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once they do so, Larson must go beyond his pleadings and designate specific

---

[9]Although Texas law is relevant only to the substantive sufficiency of the evidence, not to its *admissibility*, it is mentioned here for the sake of completeness.

facts showing there is a genuine issue for trial. *See id. at 324;*
*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en
banc) (per curiam). An issue is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
Larson's failure to produce proof as to any essential element
renders all other facts immaterial. *Trugreen Landcare, L.L.C. v.
Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).
Summary judgment is mandatory where Larson fails to meet this
burden. *Little*, 37 F.3d at 1076.

V

Both defendants move for summary judgment on the ground that
Larson cannot establish a causal connection between the allegedly
negligent acts and his injuries.

A

Under Texas law,

> to prevail on a medical negligence cause of
> action, a plaintiff must prove 1) a duty by
> the physician/nurse/hospital to act according
> to applicable standards of care; 2) a breach
> of the applicable standard of care; 3) an
> injury; and 4) a causal connection between the
> breach of care and the injury.

*Clements v. Conard,* 21 S.W.3d 514, 522 (Tex. App. 2000, pet.
denied). "[T]he ultimate standard of proof on the causation issue
is whether, by a preponderance of the evidence, the negligent act
or omission is shown to be a substantial factor in bringing about

the harm and without which the harm would not have occurred."
*Kramer*, 858 S.W.2d at 400.

In seeking summary judgment on causation grounds, Dr. Matter relies on the exclusion of Larson's expert causation testimony, which the court addresses above. Because the court has declined to exclude this testimony, and because Larson's expert testimony raises a genuine issue of fact regarding the causal connection between Larson's injuries and Dr. Matter's alleged negligence, Dr. Matter's motion for summary judgment is denied.

Baylor also partially relies in its summary judgment motion on the exclusion of this testimony. For the same reasons, the court denies Baylor's motion to the extent based on the exclusion of Larson's expert causation testimony.

B

1

Baylor maintains in the alternative that, even if the expert testimony is admissible, it negates any causal connection between the nurses' negligence and Larson's injuries. Baylor posits that this holds true because the experts agree that simply stopping the administration of Heparin, without administering another anticoagulant (such as Lepirudin), would not have prevented Larson's injuries. And it maintains that Larson's complaint does not allege a causal connection between the nurses' negligence and Larson's ultimate failure *to receive another anticoagulant* (but

only his continuing receipt of Heparin).  The court disagrees.

Larson alleges in his amended complaint that the Baylor nurses breached their duty of care by, *inter alia,* "[f]ailing to institute appropriate nursing interventions for Mr. Larson, a patient with signs of HIT, including discontinuing Heparin, notifying Dr. Matter and appropriate medical staff, and *obtaining immediate evaluation by an appropriate physician*."  Am. Comp. ¶ 7.2(m) (emphasis added). And as explained above, Larson's experts opine that a physician with relevant expertise (such as a hematologist) would have stopped the administration of Heparin and administered an alternative anticoagulant.  Based on this testimony, if the nurses had consulted with a physician of appropriate expertise, as they were allegedly required to do, Larson's injuries would have been prevented.  Nothing in the testimony negates the causal connection between the nurses' alleged negligence and Larson's injuries.

2

Baylor next contends that Dr. Matter's conduct represents a superseding cause that defeats causation.

A superseding cause, i.e., a "new and independent cause," is defined as "an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury."  *Benitz v. Gould Group,* 27 S.W.3d 109, 116 (Tex. App. 2000, no pet.).  The threshold

question in determining whether an act is a new and independent cause is "whether the second actor's negligent act was foreseeable." *Id.* "The new and independent cause must be one incapable of being foreseen by the original wrongdoer in the exercise of ordinary care." *Id.*

Baylor maintains that Dr. Matter's decision to continue administering Heparin, even after the nurses had alerted him to the signs that Larson had HIT/HITTS, amounts to a superseding cause. But Baylor does not dispute the fact that its nurses were capable of foreseeing that Dr. Matter would continue Heparin treatment, or that they were in fact aware of Dr. Matter's decision. *Cf.* D. Matter Mar. 14, 2008 App. 4 (Dr. Froehlich expert report) (reviewing nurses' notations that they were aware of Dr. Matter's decision to continue Heparin treatment). A reasonable jury could therefore reject Baylor's assertion that Dr. Matter's negligence was a new and independent cause of Larson's injuries.[10] In fact, Larson complains that the nurses were negligent in part *because*

_____

[10]Baylor cites *Ly v. Schmidt*, 2007 WL 2461984, at *8 (Tex. App. Aug. 28, 2007, no pet.) (not designated for publication), which held that one doctor's independent decision to administer anticoagulation therapy broke the causal connection between the plaintiff's injury and another doctor's faulty medical report (because the intervening doctor did not rely on that report). But *Ly* contains no suggestion that the intervening doctor's actions were, as in Larson's case, capable of being foreseen, or that the court would otherwise have had a basis for disregarding the well-settled unforeseeability requirement.

they were aware of Dr. Matter's decision and failed to intervene.[11]
Accordingly, Baylor's motion for summary judgment is denied as to
Larson's negligence claim.

VI

Finally, the court turns to defendants' contentions that
Larson's gross negligence claims must be dismissed.

A

Under Texas law, a plaintiff is entitled to exemplary damages
if he establishes that a defendant acted with "gross negligence."
Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (Vernon 2008). Gross
negligence is defined as an act or omission:

> (A) which when viewed objectively from the
> standpoint of the actor at the time of its
> occurrence involves an extreme degree of risk,
> considering the probability and magnitude of
> the potential harm to others; and
>
> (B) of which the actor has actual, subjective
> awareness of the risk involved, but
> nevertheless proceeds with conscious
> indifference to the rights, safety, or welfare
> of others.

Id. § 41.001(11) (Vernon 2008).

---

[11]In contending that Dr. Matter's conduct was a superseding
cause, Baylor argues that its nurses would not have had the
authority to intervene. For reasons already explained, the
doctrine of "superseding cause" is not an effective vehicle for
this argument, because Dr. Matter's conduct was nevertheless
foreseeable. Perhaps Baylor's position is better characterized as
an argument that the nurses did not breach their duty of care
because they lacked authority to intervene. But Baylor does not
move for summary judgment on this basis, so the court need not
reach this question.

> Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. Under the first element, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. Under the second element, actual awareness means that the defendant knew about the peril, but its acts or omissions demonstrated it did not care. Circumstantial evidence is sufficient to prove either element of gross negligence.

*Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) (citations omitted).

Gross negligence must be established by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)-(c) (Vernon 2008). "[C]lear and convincing evidence is defined as that 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Foley v. Parlier*, 68 S.W.3d 870, 880 (Tex. App. 2002, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 1997); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994)).

## B

As the court explains above, because Larson will have the burden of proof on this claim at trial, defendants can obtain summary judgment by pointing the court to the absence of evidence to support Larson's claim. Once they do so, Larson must go beyond his pleadings and designate specific facts showing there is a

genuine issue for trial. An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Larson's failure to produce proof as to any essential element renders all other facts immaterial. Summary judgment is mandatory where Larson fails to meet this burden.

Moreover, Larson shoulders a greater burden in the context of his gross negligence claim because gross negligence must be established by clear and convincing evidence.

> When a heightened proof standard will apply at trial, that standard controls at the summary judgment stage. Under Texas law, gross negligence must be proved by clear and convincing evidence. This standard requires that plaintiffs adduce evidence that is sufficient to make the existence of the facts highly probable, not merely evidence that is sufficient to make the existence of fact more probable than not, as required by the preponderance standard. Therefore, the proof must be sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established.

*Perez Librado v. M.S. Carriers, Inc.*, 2004 WL 1490304, at *2 (N.D. Tex. June 30, 2004) (Fitzwater, J.) (citations and quotation marks omitted).

C

Applying Texas principles of gross negligence and federal summary judgment procedure, the court holds that the evidence on which Larson relies is insufficient to produce in the minds of reasonable jurors a firm belief or conviction that Dr. Matter or

the Baylor nurses continued to administer Heparin treatment "with conscious indifference to the rights, safety, or welfare of" Larson, as Texas law requires. The second element of the gross negligence formulation requires that a reasonable jury be able to find that it is highly probable——i.e., by clear and convincing evidence——that Dr. Matter or the Baylor nurses "knew about the peril, but [their] acts or omissions demonstrated that *[they] did not care*." *Mobil Oil Corp.*, 968 S.W.2d at 921 (emphasis added). Larson has not adduced the necessary proof.

Although Larson points to Dr. Matter's deposition testimony admitting that he was aware of the risks of continuing Heparin treatment, Dr. Matter explains in the same testimony that he chose to continue this treatment despite these risks because he thought it was necessary to address Larson's pulmonary embolism. And although Larson points to Nurse Carlson's bare legal conclusion that the Baylor nurses were grossly negligent, this conclusory opinion——unaccompanied by any explanation——is plainly insufficient to allow a reasonable jury to find by clear and convincing evidence that the nurses were grossly negligent. Moreover, Dr. Froehlich's expert report indicates that the nurses acted, not out of a lack of concern, but out of deference to Dr. Matter's judgment. D. Matter Mar. 14, 2008 App. 4 (Dr. Froehlich expert report) (reporting nurse notation that read: "[a]sked [Dr.] Matter to turn off the [H]eparin. He said 'Do not stop [H]eparin.' Will follow M.D.

orders.").

Accordingly, Larson's claims for gross negligence are dismissed with prejudice.

*     *     *

In sum, the court grants defendants' summary judgment motions as to Larson's claims for gross negligence and otherwise denies the motions. The court grants Dr. Matter's motion to exclude the standard-of-care testimony of Dr. Froehlich, and it otherwise denies the motions. Larson has stipulated that Nurse Carlson will not testify as to Dr. Matter's standard of care or medical causation, but will instead offer an opinion only on the standard of care applicable to nurses. Based on this stipulation, Dr. Matter's motion to exclude the testimony of Nurse Carlson is therefore denied as moot.

**SO ORDERED.**

August 18, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE